**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | | |
|---|---|---|
| KERRY ZIEGER, | ) | No. 79394-2-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CITY OF SEATTLE, a municipal | ) | UNPUBLISHED OPINION |
| subdivision in the State of Washington, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

MANN, C.J. — Kerry Zieger, a Seattle police officer, appeals the summary judgment order dismissing his negligence lawsuit against the City of Seattle (City) arising from an injury he suffered, while on-duty, during a protest on May Day 2016. Zieger contends that the trial court erred when it concluded that he failed to present a dispute of material fact demonstrating the City breached its duty and the breach proximately caused Zieger's injury. We disagree and affirm.

I.

A.    <u>May Day 2016</u>

The Seattle Police Department (SPD) anticipated and planned for several marches and protests on May Day in 2016. The "Workers' and Immigration Rights

Citations and pin cites are based on the Westlaw online version of the cited material.

March" began in the morning as a large permitted demonstration. In the early evening hours, another group gathered downtown in Westlake Park for an unpermitted event referred to as the "May Day Anti-Capitalist March." In the past, similar events resulted in violence and property damage. SPD anticipated the use of homemade weapons, ranging from hammers and wrenches to bricks, construction debris, and fireworks.

Zieger was assigned to bicycle patrol during the anti-capitalist part of the May Day protests. Because Zieger was not a full-time bike officer, SPD issued him a bicycle and helmet on the day of the protests. Zieger already had SPD issued eye protection and hardened body gear.

The day of the protest, two different styles of bicycle helmets were in use, the standard Zen or Hex model (collectively referred to as the "standard helmet") and the Bell Super 2R.[1] The Bell Super 2R provides more facial protection because it has removable chin protection and the ability to integrate goggles. When Zieger arrived for his gear, all Bell Super 2R helmets were in use; thus, he was provided with the standard helmet. Other officers in his bicycle squad were also provided standard helmets instead of the Bell Super 2R helmets that day.

After receiving his gear, Zieger and his squad proceeded to Westlake Park in downtown Seattle. Zieger patrolled an area outside a parking lot on Second Avenue near either Stewart or Pine Street when he heard that two officers from another squad were surrounded by protestors. Zieger and his squad cleared a path through the protestors to reach the trapped officers. The trapped officers were in an alcove of a

---

[1] It is unclear from the record exactly which standard helmet Zieger wore, but it appears the Zen or Hex models are similarly different from the Bell Super 2R.

building. Zieger and his squad formed a protective fence around the officers while they regrouped and extracted the officers. In the process of regrouping, Zieger realized that a crowd of 50 to 70 people was shouting in front of them. This crowd was not part of the main march. The crowd began throwing objects at the officers, including a road flare. Zieger saw the road flare land behind them and looked back to make sure it was not a bomb. As Zieger turned around, he saw a rock coming toward him and felt it hit his forehead above his left eye. Blood from his wound got in his eye and affected his vision. A SWAT (special weapons and tactics) team arrived and deployed less-lethal munition to diminish the crowd. Zieger deployed his pepper spray and fellow officers escorted him to a transport van for medical treatment.

Due to his injuries, Zieger took six weeks off from work to recover. Zieger has a permanent scar and suffers from periodic headaches and numbness connected to his injury.

B.     Acquisition of the Bell Super 2R Helmet

SPD began purchasing and integrating the Bell Super 2R, bicycle helmets into its bicycle squad at the end of 2014. Sergeant James Dyment has served as a supervisor on the City's bike squad since 2012 and was involved in equipment selection and acquisition. In this role, he would identify a need, assess the benefits of different equipment available for purchase and get permission from the chain of command to purchase the equipment when he thought that it would be an improvement from SPD's current equipment.

In 2013, Dyment began looking for overall protective gear in response to an officer injuring his knee. This search included looking for more protective helmets.

-3-

Dyment was unable to find any helmets specifically marketed as riot gear for bicycle officers. Instead, Dyment was familiar with a new helmet, designed for "Enduro" style racing, and thought it would suit SPD's needs for more protective gear. Specifically, the Bell Super 2R has a removable chin guard and SPD could combine the Bell Super 2R with "military specified goggles" to create "much better protection" than any other helmets on the market. Also, an integrated venting system allows goggles to vent through the helmet and prevents fogging.

Bike helmets are essential equipment, but SPD Deputy Chief Marc Green indicated that on May 1, 2016, equipping bike officers with a Bell Super 2R helmet was not considered essential. "[A]t that time there was no rule, custom, or practice within SPD that established this newer style of helmet as 'essential safety equipment.'" Consistent with SPD's practice of incrementally and proactively improving its protective equipment, SPD was transitioning to the Bell Super 2R helmet, but the standard helmets had been "successfully [in] use by SPD for years prior to May 1, 2016, and continued to be in use as of that date."

After Zieger's injury the City asked Dyment to evaluate whether the Bell Super 2R could have prevented a head injury like Zieger's. Dyment expressed his opinion that "it would have mitigated that injury and potentially stopped that injury just based on the integration of the goggle and helmet itself and the nature in which his injury was sustained," and he believed "that the goggles did provide some significant protection to [Zieger], based on where his injury occurred."[2]

---

[2] It is unclear from the record how familiar Dyment was with the location of Zieger's injury. Further, Dyment provided his opinion to SPD in hindsight.

C.

Zieger sued the City claiming that SPD was negligent for failing to prevent or protect him from the assault. Zieger alleged that SPD failed to exercise reasonable care by (1) not issuing a prompt dispersal order; (2) by not providing him with the Bell Super 2R helmet; and (3) by not providing him less-lethal munitions known as "blast balls."

The City moved for summary judgment contending that Zieger lacked sufficient evidence to establish negligence and proximate cause on all three claims. The trial court granted summary judgment on all three claims. Zieger appeals only the trial court's conclusion that Zieger failed to present a dispute of material fact that the City had breached its duty to equip Zieger with a Bell Super 2R helmet and this failure caused his injury.

II.

We review summary judgment orders de novo. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Summary judgment is appropriate if there "is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." CR 56(c). "In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact." Young, 112 Wn.2d at 225. If the defendant is the moving party and makes their initial showing, the inquiry shifts to the party with the burden of proof at trial to make a showing sufficient to establish the existence of an element essential to that party's case. Young, 112 Wn.2d at 225. If the party with the burden of proof at trial fails to make that showing, then the trial court should grant summary judgment. Young, 112 Wn.2d at

225. In reviewing summary judgment, the court considers all facts and inferences in the light most favorable to the nonmoving party. Donatelli v. D.R. Strong Consulting Eng'g, Inc., 179 Wn.2d 84, 89, 312 P.3d 620 (2013).

To establish a claim of negligence, a plaintiff must prove the following elements: (1) that the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) injury to the plaintiff resulted; and (4) the defendant's breach was the proximate cause of the injury. Hoffstatter v. City of Seattle, 105 Wn. App. 596, 599, 20 P.3d 1003 (2001). "Negligence is generally a question of fact for the jury, and should be decided as a matter of law only 'in the clearest of cases and when reasonable minds could not have differed in their interpretation' of the facts." Bodin v. City of Stanwood, 130 Wn.2d 726, 741, 927 P.2d 240 (1996) (quoting Young v. Caravan Corp., 99 Wn.2d 655, 661, 663 P.2d 834 (1983)). At issue before us is whether the City breached a duty of care and whether the breach was the proximate cause of Zieger's injury.

A.

Zieger contends that the trial court erred in concluding that the breach of duty he alleged was not within the ordinary knowledge and experience of laypersons, and thus needed expert testimony. We disagree.

The parties do not dispute that cities owe employee police officers a statutory duty not to injure them by negligent acts or omissions. RCW 41.26.281; Locke v. City of Seattle, 133 Wn. App. 696, 705, 137 P.3d 52 (2006). The Law Enforcement Officers' and Firefighters' (LEOFF) Retirement System provides a cause of action, stating:

> If injury or death results to a member from the intentional or negligent act
> or omission of a member's governmental employer, the member, the
> widow, widower, child, or dependent of the member shall have the

-6-

> privilege to benefit under this chapter and also have cause of action against the government employer as otherwise provided by law, for any excess of damages over the amount received or receivable under this chapter.

RCW 41.26.281. The trial court acknowledged that the City owed a duty to Zieger under RCW 41.26.281 to "provide equipment that does not fall below the standard of care for police department employers." The trial court concluded, however, that "the breaches alleged by Officer Zieger are not within the ordinary knowledge and experience of laypersons" and absence of an expert in this case "calls into question whether [Zieger] can meet his evidentiary burdens."

To determine whether expert testimony is required as a matter of law, the court determines whether the evidence is such that the fact finder requires expert testimony to aid it in understanding the evidence or in determining an ultimate fact in issue. ER 702; 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE § 702.16, at 71 (6th ed. 2016). We review de novo whether expert testimony was required as a matter of law. Pagnotta v. Beall Trailers of Oregon, Inc., 99 Wn. App. 28, 36, 991 P.2d 728 (2000). "The pertinent inquiry is, of course, whether the subject would be commonly understood among lay people, not whether the subject would be commonly understood among experts. A subject that is commonly understood by experts is unobjectionable on that basis." 5B TEGLAND, supra, § 702.16, at 73.

Ziegler's claim requires the fact finder to understand the standard of care for a reasonable police department outfitting its bike officers for riot conditions, and whether SPD's actions were prudent given the standard of care. We agree with the trial court that this is not something commonly understood by a lay person. For example, neither

helmet is specifically designed for police use in riot conditions. Indeed, the record reflects that there is no industry standard related to these helmets. Without an industry or department standard, a lay person is unlikely to understand the standard of care.

Moreover, Zieger's contention that SPD should not have deployed him without a Bell Super 2R helmet necessarily implies that SPD made tactical decisions between deploying a full fleet of bike officers equipped with both the standard helmets and the Bell Super 2R helmet, or deploying less bike officers who were all equipped with the Bell Super 2R helmet. This type of decision is also not within the ordinary knowledge and experience of laypersons because tactical decisions require specialized knowledge. It could well be that deploying fewer officers—only those with the Bell Super 2R helmet—would have put those officers at greater risk of harm.[3] This is not within the common knowledge of a lay person.

On appeal, Zieger argues that the City's witness, Dyment, provided the expertise necessary. While Dyment might be qualified, he did not testify that reasonable prudence called for the Bell Super 2R helmet for all officers on May Day 2016. To the contrary, Dyment testified that the Bell Super 2R is still not an official industry or department standard. While Dyment believed the Bell Super 2R was a superior helmet, and the integrated goggles could have provided better protection, this does not demonstrate that ordinary care or reasonable prudence required the City to deploy only officers wearing the Bell Super 2R helmet.

_____

[3] At oral argument, Zieger's counsel conceded that, had SPD deployed only officers wearing the Bell Super 2R helmet, the result would have meant a smaller police presence to conduct crowd control. Even if the smaller police presence had superior equipment, there could have been a greater risk of harm to those officers and bystanders because it would have been more difficult to effectively control the protestors' movement with less police presence.

We agree with the trial court that Zieger's breach of duty claim required expert testimony.

B.

While Zieger offered no expert testimony on the standard of care, the trial court nonetheless examined whether he could meet his burden to establish the standard of care and breach of that duty. Ziegler contends that the trial court erred in concluding that he failed to demonstrate a genuine issue of fact showing that the City breached the duty of care owed to him on May Day 2016. We disagree.

"Breach is the failure to exercise ordinary care, or alternatively phrased, the failure to exercise such care as a reasonable person would exercise under the same or similar circumstances." Mathis v. Ammons, 84 Wn. App. 411, 416, 928 P.2d 431 (1996). Whether the facts establish breach is a question of fact. Hertog v. City of Seattle, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

Here, Zieger makes the conclusory argument that:

[t]he standard of care required the City to exercise reasonable care, not minimal or inferior care. The City's actions and rationale in selecting and purchasing the Bell Super 2R over the regular bicycle helmet is evidence demonstrating the City rejected the old bicycle helmet because it no longer met the safety needs of its bicycle squad officers.

(Emphasis added). Zieger failed, however, to offer evidence demonstrating that SPD rejected the use of the standard helmet. Instead, SPD continued to use the standard helmet during the transition period. Zieger has not pointed to any custom or practice in

other police departments demonstrating a rejection of the standard helmet or that other departments have rejected phased acquisition of new equipment.[4]

Zieger contends that he presented evidence that SPD should have known that the standard helmet had apparent shortcomings because SPD believed the Bell Super 2R offered superior protection. Therefore, Zieger argues, deploying officers with the standard helmets once SPD began purchasing a superior helmet was a breach of the standard of care. Zieger mischaracterizes the evidence of SPD's proactive activities to find more protective equipment as evidence that the standard of care changed. While Zieger is correct that the City was in the process of upgrading to a more protective helmet, Zieger failed to present evidence that SPD affirmatively determined that the standard helmet was unsuitable for bicycle officers in riot conditions. Zieger asks this court to allow the jury to assume that the standard helmet was below the standard of care because SPD began purchasing a helmet with better face protection. While it is undisputed that the Bell Super 2R provides more protection for its wearer, Zieger has failed to present evidence, from which a reasonable juror could conclude that the standard helmet fell below the standard of care.

The trial court did not err when it concluded that Zieger did not present evidence to establish a dispute of material fact on the issue of breach.

---

[4] Zieger points to a May 2, 2016, e-mail from then SPD Chief, Kathleen O'Toole, where she indicated that the Bell Super 2R protected an officer from an injury on May Day 2015, and that this statement demonstrates that SPD knew it needed superior helmets to protect against injuries like the one sustained by Zieger. Zieger contends that this e-mail shows that "the City was aware that a prior injury was prevented with the Bell Super 2R helmet," "but failed to ensure there were enough higher protection helmets for the augment officers who were working on May Day 2016." Regardless of O'Toole's statement, Dyment, who was in charge of searching for more protective equipment, had no knowledge of the May 2015 head injury when he was making his decision to purchase the Bell Super 2R helmet.

C.

Zieger next contends that the trial court erred in concluding that he failed to demonstrate a genuine issue of material fact to show the City's failure to provide him the Bell Super 2R helmet was the proximate cause of his head injury. Again, we disagree.

Proximate causation has two elements: cause in fact and legal causation. Michaels v. CH2M Hill, Inc., 171 Wn.2d 587, 609, 257 P.3d 532 (2011). To establish cause in fact, a plaintiff must show "that the harm suffered would not have occurred but for an act or omission of the defendant." Joyce v. State Dep't of Corrections, 155 Wn.2d 306, 322, 119 P.3d 825 (2005). Whether the defendant's acts were a "but for" cause of the plaintiff's injury is typically a question of fact for the jury. Ang v. Martin, 154 Wn.2d 477, 482, 114 P.3d 637 (2005) (internal quotation marks omitted).

Legal causation is a question of law. Kim v. Budget Rent A Car Sys., Inc., 143 Wn.2d 190, 204, 15 P.3d 1283 (2001). "The focus in the legal causation analysis is whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." CH2M Hill, 171 Wn.2d at 611 (internal quotations omitted). "A determination of legal liability will depend upon mixed considerations of logic common sense, justice, policy, and precedent." CH2M Hill, 171 Wn.2d at 611 (internal quotations omitted).

"The plaintiff need not establish causation by direct and positive evidence, but only by a chain of circumstances from which the ultimate fact required is reasonably and naturally inferable." Attwood v. Albertson's Food Ctrs. Inc., 92 Wn. App. 326, 331, 966

P.2d 351 (1998). "But evidence establishing proximate cause must rise above speculation, conjecture, or mere possibility." Attwood, 92 Wn. App. at 331.

Zieger offers Dyment's deposition as evidence that creates a dispute of material fact on causation. Specifically, Zieger contends that he presented evidence to show that Dyment was intimately involved with and tasked by SPD to improve gear and equipment for the SPD bicycle squad. Zieger contends that "Dyment explained in detail his knowledge of the design and benefits of the Bell Super 2R helmet and ultimately why the Department selected" those helmets and that he expressed an opinion that the Bell Super 2R would have mitigated or potentially stopped the injury. This testimony, Zieger contends, established a dispute of material fact on the issue of "but for" causation.

Reviewing the evidence in the light most favorable to the nonmoving party, the evidence does not present a dispute of material fact. But for causation requires Zieger to show that, had SPD provided him with the Bell Super 2R helmet, he would not have sustained his injury, or the injury would have been substantially mitigated. There is nothing in the record showing the location of Zieger's injury or how the two helmets fit on Zieger's head. Zieger cites a photograph in the record showing a group of officers at the 2016 May Day protests with some officers wearing the standard helmet and others wearing the Bell Super 2R. The photograph was taken from a distance and is not evidence from which a reasonable juror could conclude that, had Zieger been wearing the Bell Super 2R, he would have been protected from a projectile. In addition, the photograph shows, even in wearers of the Bell Super 2R, there is a gap between the rim of the helmet and the goggles where skin remains exposed.

Further, Dyment indicated that the facial protection provided by the Bell Super 2R depends on how big the wearer's head is relative to the helmet size. Dyment indicated that he has a larger head and so more of his face and head is exposed than someone with a smaller head. Dyment also indicated that there is no adopted official standard that makes the Bell Super 2R helmets the standard helmet for bicycle officers doing crowd control in riot conditions. Further, the International Police Mountain Biking Association's standard helmet is the ANSI Snell standard, which is not used by SPD.

Zieger cites the following portion of Dyment's deposition as evidence of a dispute of material fact over causation:

> Q. Okay. So do you have any specific recollection of what you actually said in terms of what your concerns were? So what exactly you expressed about the issue concerning the helmet?
>
> A. [Dyment]: When you say "specific," I can't give you the exact dialogue I had and with who.
>
> Q. Yeah.
>
> A. But I believe that it was requested of me to evaluate what my thoughts—hey, does this helmet protect officers better and so would it have stopped this injury or what have you, was my discussion with them, and you know, I can't guarantee that it would stop that. There is no way to say, "Hey, if you got a rock thrown at your head and you're wearing that helmet it's not going to hurt you." I can't give that guarantee.
>
> I believe it would have mitigated that injury and potentially stopped that injury just based on the integration of the goggle and the helmet itself and the nature in which his injury was sustained which, you know, I believe that the goggles did provide some significant protection to [Zieger], based on where his injury had occurred, and I think that that the helmet/goggle integration is much better than the one on the Zen or Hex, and I hadn't seen—he either had a Zen or Hex, I believe. Just from looking at—over on the video from my recollection it might have been a slightly different helmet, but that style of helmet, that integration.
>
> Q. Okay. And I think you pretty much explained in your answer, but I just want to have a little more clear answer for the record.

-13-

A. Uh-huh.

Q. So what about that integration system for the Bell Super 2R do you believe would have potentially mitigated the injury that [Zieger] suffered on May Day?

A. Just the fact that it's designed to be integrated, right?

Q. Okay.

A. I mean, so that where they join is, I think—and the fit system on that helmet potentially could have provided better protection for him right? So I can't say, hey, for sure—

Q. Sure.

A. —he would not have gotten hurt if he was wearing that helmet, right? I don't think anybody could potentially say that, but I think it would have—I believe it probably would have—it would have—it probably would have worked, right? I mean, we didn't test if, but the fact that it's designed and you have that lip and level—it would have protected him from that helmet.

Dyment's testimony is based on his concerns he expressed to SPD following Zieger's injury. This does not satisfy Zieger's burden to establish a dispute of material fact for the issue of "but for" causation. Even if Dyment were qualified to testify about causation, Dyment could only speculate that the Bell Super 2R would have prevented or mitigated Zieger's injury. Dyment indicates that it potentially could have mitigated Zieger's injury, but that he cannot say for sure.

The trial court did not err when it concluded that Zieger failed to present evidence to establish a dispute of material fact on the element of causation.

We affirm.

_____ Mann, C.J. _____

WE CONCUR:

_____ _____ Dwyer, J.