115 P.3d 393 (2005)
Patricia A. SOLTERO, Respondent,
v.
Kenneth L. WIMER, Appellant.
No. 22942-4-III.
Court of Appeals of Washington, Division Three, Panel Three.
July 12, 2005.
*394 Allen M. Gauper, Salina, Sanger and Gauper, Spokane, WA, for Appellant.
Robert R. Cossey, Robert R. Cossey & Associates PS, Spokane, WA, for Respondent.
BROWN, J.
¶ 1 Patricia Soltero sued Kenneth Wimer, seeking an equitable distribution of property based upon their nine-year meretricious relationship. The trial court concluded a meretricious relationship existed and an equitable distribution of property was $135,000. Mr. Wimer appealed both conclusions. Because the trial court acted within its discretion under these facts, we affirm.

*395 FACTS
¶ 2 Kenneth Wimer and Patricia Soltero met in 1972. They referred to this as, "Friendship Affirmation Day." Report of Proceedings (RP) at 158. Mr. Wimer and Ms. Soltero met again in 1983 and began dating in a non-exclusive relationship until 1992, when Ms. Soltero moved in with him and stayed through 2001. According to Ms. Soltero, Mr. Wimer discussed sharing the rest of his life with her and wanting to take care of her.
¶ 3 In 1994, Ms. Soltero left her job and began working at Mr. Wimer's motorcycle-ATV-snowmobile business, Westside Honda, in various capacities. Ms. Soltero said she worked long hours and was basically "on call." RP at 193. Ms. Soltero eventually received an $18,000 annual salary; an amount she and Mr. Wimer had determined was needed to run the household. Additionally, Mr. Wimer deposited $400 into her account monthly for household expenses.
¶ 4 During this time, Mr. Wimer opened another similar business and managed his real estate. Ms. Soltero testified she decorated Mr. Wimer's homes, cooked for him, and their guests, and his clients. Additionally, she cleaned, bought Mr. Wimer's personal items, and worked in the garden. She added Mr. Wimer to her checking account, but he did not draw money from it.
¶ 5 In 1996, Mr. Wimer purchased a $500,000 cabin at Priest Lake. Ms. Soltero testified she contributed resources and energy into making improvements to the Priest Lake property. In 1999, Mr. Wimer purchased property at Lamb Creek. Ms. Soltero testified her efforts improved this property as well. Ms. Soltero testified she personally purchased items for the homes. Ms. Soltero conceded Mr. Wimer's company paid for the major improvements, mortgages, and utilities. Ms. Soltero was never a shareholder or officer in Mr. Wimer's companies, nor was she named on the title of Mr. Wimer's properties.
¶ 6 Ms. Soltero described their relationship as "very, very best friends. More than marriage." RP at 319. Ms. Soltero testified she and Mr. Wimer had an exclusive sexual relationship. Several of Ms. Soltero's witnesses described her as dedicated to Mr. Wimer's home and businesses. These witnesses "saw them as a committed couple in a marital-like relationship." Clerk's Papers (CP) at 5. Ms. Soltero presented cards from Mr. Wimer "generally describing a caring and grateful partner variously signed as `Love, Love You' or similar ending sentiments." CP at 5.
¶ 7 Ms. Soltero's expert valued the increased book value of Mr. Wimer's business interests to have grown a minimum of $326,000 from 1992 through 2001. After the parties separated, part of Mr. Wimer's businesses sold for $1.25 million that he had purchased in 1974 for $50,000. Mr. Wimer's net estate grew from $1.5 million to "in excess of $4.5 million." CP at 4.
¶ 8 Mr. Wimer denied wanting a committed relationship, but admitted being Ms. Soltero's friend, roommate, and sexual partner. He agreed the relationship was exclusive from 1992 through 2001. Denying any intent to share his investments or businesses, Mr. Wimer testified, "She was not my partner. She was just my friend." RP at 512. He became dissatisfied with the relationship starting in 1994 or 1995, but he felt obligated to stay in the relationship because Ms. Soltero was ill. Mr. Wimer ended the relationship in 2001 by letter.
¶ 9 The trial court made findings and consistent conclusions by letter opinion, concluding a meretricious relationship existed. The court characterized Mr. Wimer's assets as all separate property. In analyzing Ms. Soltero's equitable property distribution rights, the court discarded an earnings approach as "a push." CP at 10. Then, the court concluded $135,000 was equitable based upon "other services provided as a cohabitating, committed, long-term companion, including the obligations of running the household and business/social matters, net (meaning after consideration for board and room)." CP at 10. This amount, the court reasoned, equated to $15,000 a year for nine years.
¶ 10 Finally, the trial court held: "I find in favor of the petitioner; i.e.; a meretricious relationship existed for the nine years of their exclusive cohabitation and that an equitable distribution of the property requires an *396 award of $135,000.00 to Ms. Soltero." CP at 10. Mr. Wimer appealed.

ANALYSIS

A. Meretricious Relationship
¶ 11 The issue is whether the court abused its discretion in holding a meretricious relationship existed between the parties, justifying an equitable property distribution to Ms. Soltero.
¶ 12 We review whether substantial evidence supports the court's findings of fact, and whether the findings of fact support the court's conclusions of law. In re Marriage of Hilt, 41 Wash.App. 434, 438, 704 P.2d 672 (1985).
¶ 13 A meretricious relationship is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist. In re Marriage of Lindsey, 101 Wash.2d 299, 304, 678 P.2d 328 (1984). Courts have established several non-exclusive factors for finding this type of marital-like relationship exists, including: continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties. Id. at 304-05, 678 P.2d 328.
¶ 14 The court found, and Mr. Wimer essentially concedes, the relationship was stable, of sufficient duration, and the parties continuously cohabited.
¶ 15 The court found Ms. Soltero contributed "little, if any, financial benefit" to the relationship. CP at 22. Mr. Wimer gave Ms. Soltero $400 a month for household expenses. Otherwise, their finances remained completely separate, and the parties had no joint purchases or liabilities. Even so, the court found Ms. Soltero contributed resources to the success of Mr. Wimer's businesses as an employee, and as a partner in a marital-like relationship would have done. This finding is supported by the evidence. Ms. Soltero ran Mr. Wimer's households, worked many hours in his businesses doing whatever needed to be done, decorated and kept his homes, and organized, planned, and contributed to his social and business functions. In this manner, the parties pooled their resources.
¶ 16 While Mr. Wimer denied he intended to be in a committed relationship with Ms. Soltero, the court found the evidence, as a whole, showed he intended to have a relationship with Ms. Soltero including "companionship, friendship, love, sex and mutual support and caring," and that this was the purpose of the relationship. CP at 22. Mr. Wimer and Ms. Soltero lived together and had an exclusive relationship from 1992 through 2001. Ms. Soltero dedicated her resources to Mr. Wimer's homes and businesses. They supported each other in work, family, and social activities and went on trips and celebrated holidays together with their family and friends. Both agreed to live together in a stable, exclusive relationship. This supports the court's conclusion of a marital-like relationship.
¶ 17 In sum, on this record we find the court did not err in finding a meretricious relationship existed between Mr. Wimer and Ms. Soltero. Although the parties maintained separate accounts and identities, the duration of continuous and exclusive cohabitation, the contribution to the homes and businesses, and their joint efforts on behalf of the relationship support the court's conclusion that this was a marital-like relationship. See In re Meretricious Relationship of Sutton & Widner, 85 Wash.App. 487, 491, 933 P.2d 1069 (1997); see also Connell v. Francisco, 127 Wash.2d 339, 346, 898 P.2d 831 (1995) ("While a `long term' relationship is not a threshold requirement, duration is a significant factor."); see also Hilt, 41 Wash.App. at 438-39, 704 P.2d 672 (upholding finding of meretricious relationship based on length of relationship and contributions, even though the parties maintained separate accounts).

B. Equitable Property Distribution
¶ 18 The issue is whether the court abused its discretion in awarding Ms. Soltero $135,000 as an equitable property distribution in this meretricious relationship.
¶ 19 Courts must make a just and equitable distribution of property following a *397 meretricious relationship. Connell, 127 Wash.2d at 347-48, 898 P.2d 831. "Once a trial court determines the existence of a meretricious relationship, the trial court then: (1) evaluates the interest each party has in the property acquired during the relationship, and (2) makes a just and equitable distribution of the property." Id. at 349, 898 P.2d 831. A court's distribution of property following a finding of a meretricious relationship is reviewed for abuse of discretion. Sutton, 85 Wash.App. at 492, 933 P.2d 1069.
¶ 20 "The critical focus is on property that would have been characterized as community property had the parties been married. This property is properly before a trial court and is subject to a just and equitable distribution." Connell, 127 Wash.2d at 349, 898 P.2d 831. Thus, income and property acquired during a meretricious relationship is presumed to be owned by both parties and before the court for distribution, "so that one party is not unjustly enriched at the end of such a relationship." Id. This presumption can be rebutted. Id. at 351, 898 P.2d 831. Further, when community funds or efforts are utilized to increase the equity or value of separate property, the community may acquire a right of reimbursement, which may be offset by any reciprocal benefit to the community. Id.
¶ 21 Here, a large amount of Mr. Wimer's property and business assets were purchased during his relationship with Ms. Soltero. The court characterized these assets as Mr. Wimer's separate property because they were either acquired before the meretricious relationship or were purchased with separate funds. But, Mr. Wimer exclusively devoted his community-like endeavor to the improvement of his separate interests. Consequently, the growth in his separate estate between 1992 and 2001 could be considered by the court in determining a proper equitable distribution of property.
¶ 22 Ms. Soltero's expert testified the increased book value of Mr. Wimer's business interests alone increased by $326,000 during the relevant nine years. Ms. Soltero's evidence suggests half the growth could be viewed as resulting from Ms. Soltero's community-like effort. Further, Mr. Wimer purchased his first business for $50,000 and sold it not long after the meretricious relationship for ended $1.25 million. His net estate at the end of the relationship grew to $4.5 million, evidencing considerable growth.
¶ 23 The court's September 23, 2003 letter opinion framed the court's findings of fact and conclusions of law. No formal findings or conclusions were entered. In a conclusory section entitled "Pooling of Resources[,]" the court concluded Ms. Soltero's "contributions were more than just as an employee, i.e., she ran the household, organized, planned and contributed to the social/business functions as would a partner in a marital like relationship." CP at 7, 8.
¶ 24 In a conclusory section entitled "Property Distribution and Equitable Rights[,]" the court reasoned the "meretricious relationship is a fiction" sometimes "inconsistent with the goal of preventing unjust enrichment and achieving equity." CP at 9. This reasoning is consistent with Vasquez v. Hawthorne, 145 Wash.2d 103, 107, 33 P.3d 735 (2001) (equitable claims focus on the equities involved between the parties). The Vasquez court reasoned the meretricious relationship rationale is a "mere analogy" to a marital relationship. Id. "Rather than relying on analogy, equitable claims must be analyzed under the specific facts presented in each case." Id. at 107-08, 33 P.3d 735.
¶ 25 After noting the separate nature of Mr. Wimer's assets, the court partly reasoned the property division "needs to be analyzed based on the contributions of the services to the relationship that were made by Ms. Soltero" and the relevant wage and income of the parties. Id. The court first reasoned the wage and income approach was unhelpful, as it was on the surface, "a push." CP at 10. This was because the court reasoned an equitable split would be 70 percent for Mr. Wimer and 30 percent for Ms. Soltero, and the surface wages were consistent with these relevant percentages.
¶ 26 Next, the court valued "Ms. Soltero's other services provided as a cohabitating, committed, long-term companion, including the obligations of running the household and business/social matters, net (meaning after *398 consideration for board and room)," as $135,000. CP at 10. The court showed this calculation amounted to $15,000 a year for the nine-year relationship. While these services may partly be viewed as gratuitous, the court's holding dispels this notion. "I find in favor of the petitioner; i.e.; a meretricious relationship existed for the nine years of their exclusive cohabitation and that an equitable distribution of the property requires an award of $135,000.00 to Ms. Soltero." CP at 10 (emphasis added).
¶ 27 In sum, although the court's reasoning is at times somewhat obscure, considering the trial court's findings of the extent of increased wealth experienced by Mr. Wimer during this relationship and the 30 percent community-like contribution of Ms. Soltero, an award of $135,000 is well within the range of evidence. The trial court's approach is consistent with the fact-equity approach described in Vasquez. This approach is not limited by mere analogy to a marital relationship. Limiting the court to a strict marital analogy would unnecessarily restrict the trial court's ability to seek equity based upon the facts of each case. As the Vasquez court reasoned, "[e]ven when we recognize `factors' to guide the court's determination of the equitable issues presented, these considerations are not exclusive, but are intended to reach all relevant evidence." Vasquez, 145 Wash.2d at 108, 33 P.3d 735. Accordingly, we hold the trial court did not abuse its discretion in reaching equity here based upon these facts.
¶ 28 Affirmed.
I CONCUR: SCHULTHEIS, J.
SWEENEY, A.C.J. (dissenting).
¶ 29 I believe that the result the trial judge reached, and the majority affirms, is fair. But I cannot find case law to support that result.
¶ 30 First, I agree that there is ample testimony from which the judge could conclude this was a meretricious relationship.
¶ 31 The issue I struggle with is whether the court had the necessary discretionary authority to award Patricia Soltero $15,000 a year for companionship and services to the relationship. I do not believe it did.
¶ 32 The court could certainly make a just and equitable distribution of property following this meretricious relationship. Connell v. Francisco, 127 Wash.2d 339, 346, 898 P.2d 831 (1995). That is done first by evaluating "the interest each party has in the property acquired during the relationship." Id. at 349, 898 P.2d 831. There, "[t]he critical focus is on property that would have been characterized as community property had the parties been married. This property is properly before a trial court and is subject to a just and equitable distribution." Id. Income and property acquired during a meretricious relationship is presumed to be owned by both parties and before the court for distribution, "so that one party is not unjustly enriched at the end of such a relationship." Id. This presumption, like any presumption, can be rebutted. Id. at 351, 898 P.2d 831. The community may have a right of reimbursement if community funds or efforts increase the equity or value of separate property; but this may be offset by any reciprocal benefit to the community. Id.
¶ 33 Here, much of Kenneth Wimer's property and business assets were purchased during his relationship with Ms. Soltero. But, the court specifically concluded they were all his separate property because they were purchased with separate funds. This is undisputed. Ms. Soltero argues, nonetheless, that she increased the value of Mr. Wimer's homes and businesses through her efforts. But again, the court found the increases in value over this time to be due to Mr. Wimer's efforts. This is also well supported by this record. And I can find no substantial evidence that Ms. Soltero's efforts increased the value of Mr. Wimer's businesses or homes. The court then correctly concluded that none of this property was pseudo-community property nor did it err in refusing to reimburse the community for any of the increases in Mr. Wimer's property.
¶ 34 The court, instead, awarded Ms. Soltero $15,000 a year for nine years of services as a "cohabitating, committed, long-term companion, including the obligations of running the household and business/social matters." *399 Clerk's Papers at 25 (emphasis added). But, I find no basis in Washington law for such an award. See Connell, 127 Wash.2d at 349, 898 P.2d 831 (after finding a meretricious relationship, trial court must evaluate the interest each party has in the property acquired during the relationship, and make a just and equitable distribution of the property); see also In re Pennington, 142 Wash.2d 592, 604-05, 14 P.3d 764 (2000) (declining to make an equitable distribution on the basis of cooking, cleaning, and interior decoration, where plaintiff could not show she invested her time or money into one specific asset so as to create an inequity).
¶ 35 These efforts are, instead, generally seen as gratuitous:
In conformity with the general rule that where a close family relationship exists, services rendered by one member of a family to another are presumed to be gratuitous, . . . where a man and woman lived together, knowing that their relationship was meretricious, the law would not imply a promise on the part of the man to pay for the services rendered by the woman during such relationship, but would presume . . . that these services were rendered gratuitously, without expectation of payment.
Jane Massey Draper, Annotation, Recovery for Services Rendered by Persons Living in Apparent Relation of Husband and Wife Without Express Agreement for Compensation, 94 A.L.R.3d 552, 555, 1979 WL 52296 (1979). Ms. Soltero was happy to help with the household, social, and business matters without expectation of payment. See Report of Proceedings at 300, 328, 365, 372. On this record, the benefits here were reciprocal.
¶ 36 The court then erred in awarding a judgment to Ms. Soltero for her companionship and gratuitous contributions to the relationship. I therefore respectfully dissent.