[No. 77548-6. En Banc.]

Argued September 12, 2006. Decided January 18, 2007.

PATRICIA A. SOLTERO, *Respondent*, v. KENNETH L. WIMER, *Petitioner*.

*Allen M. Gauper* (of *Salina Sanger & Gauper*), for petitioner.

*Robert R. Cossey* (of *Robert R. Cossey & Associates, PS*), for respondent.

¶1 CHAMBERS, J. — Washington courts have long recognized that community-like[1] property jointly owned by partners in a meretricious relationship is subject to a just and equitable distribution when the relationship ends. This distribution resembles in many ways the distribution of community property at the termination of a marriage.

¶2 Unlike the distribution in a divorce, however, the *separate* property of the parties in a dissolving meretricious relationship is *not* subject to distribution. In this case, after a full trial, the judge below identified no community-like property. Nonetheless, he awarded one of the parties $135,000 to be paid by the other. Because an equitable distribution of community-like property requires community-like property to distribute, we reverse.

## FACTS

¶3 Kenneth Wimer and Patricia Soltero began dating in a nonexclusive relationship in 1983. In 1992, they moved in together. They stayed together through 2001, and the trial judge found that their relationship was monogamous and exclusive during that time.

¶4 Wimer owned Westside Honda in Spokane, Washington, and several associated motorcycle–all terrain vehicles–snowmobile businesses and properties. A few years into their relationship, Soltero left a job with the Cheney Federal Credit Union to work for Wimer's motorcycle dealership. Soltero was paid $18,000 a year. Wimer's salary during that time was approximately $42,000 a year, though

---

[1] For purposes of this opinion, we refer to property jointly held by putative meretricious partners as "community-like." We decline the invitation to call it "quasi-community property" because that term has other meanings in Washington statutory law, *see*, *e.g.*, chapter 26.16 RCW, or to call it "pseudo-community property" because that term implies that the property is not actually jointly held.

he was compensated in other ways as well, and he retained capital in the business itself.

¶5 During this time, Soltero moved into Wimer's house. Wimer did not charge Soltero rent. Every month, Wimer deposited $400 into Soltero's personal checking account to cover household expenses, which were minimal because most were paid for by Wimer's businesses. Wimer purchased another home and business in Priest Lake, Idaho. Soltero decorated the homes, worked in the gardens, and cooked for the couple and their guests. The trial court found that Soltero did not contribute financially to the relationship but undertook "all of the marital-like duties and obligations of the household." Clerk's Papers (CP) at 5.

¶6 Although Soltero and Wimer lived together and held themselves out to be a couple, they never purchased any personal or real property jointly nor did they commingle any money. Instead, they maintained their finances separately in separate bank accounts. Soltero did add Wimer to her checking account, but Wimer never drew money from it. During their nine-year relationship, Wimer's net worth increased from $1.5 million to more than $4.5 million, while Soltero's net worth does not appear to have materially grown.

¶7 In 2001, Wimer terminated the relationship via letter. Not long afterward, he remarried his former wife. Meanwhile, Soltero brought this suit, asserting that a meretricious relationship existed between them and seeking a distribution of their assets.

¶8 The trial court found that Soltero and Wimer had a meretricious relationship. The trial court also found Wimer had maintained his property and businesses as separate property and all rents, incomes, and profit from those businesses were also separate. The trial judge concluded:

> The vast majority, if not the entire amount, of the earnings and increased value . . . during the . . . relationship can be traced to the growth of the business, property value increase, rental

income and Mr. Wimer's benefit from early efforts and continued efforts to make the businesses and business holdings grow.

CP at 7, and:

The evidence was clear that all of the real property and business property was, remained, and is today the separate property of Mr. Wimer. Additionally, it is clear that all the rents, income and earnings, other than salary or wage income, from separate property remained separate property.

CP at 9. However, the trial court also ruled that:

Mathematical calculations, analysis and juxtaposition of numbers considering the parties' salaries, IRA contributions and other economic and financial realities leave me with the conclusion that the equitable distribution of property boils down to simply this: What is Ms. Soltero's rightful claim, if any, to an equitable distribution of the non-separate property earnings of the parties during those nine years? My analysis is as follows:

Yearly annual reasonable earnings/salary wages

| Mr. Wimer | $42,000 a year |
| Ms. Soltero | $18,000 a year |
| | $60,000 x 9 years = $540,000.00 |

An equitable split is Mr. Wimer 70%, Ms. Soltero 30%, therefore, their individual earnings is a push.[2]

The value of Ms. Soltero's other services provided as a cohabitating, committed, long-term companion, including the obligations of running the household and business/social matters, net (meaning after consideration for board and room), is:

$15,000 a year x nine years or $135,000.00

CP at 9-10. Thus, the trial court ordered Wimer to pay Soltero $135,000. Wimer appealed, arguing that no meretricious relationship existed and, in the alternative, "services" performed are not compensable. A divided panel of the Court of Appeals affirmed in part. *Soltero v. Wimer*, 128 Wn. App. 364, 115 P.3d 393 (2005). Acting Chief Judge Dennis J.

---

[2] We are not entirely certain what the trial court meant by "push." It may mean that he believed that while the salaries were community-like property, the parties had already made a fair and equitable distribution of that income stream.

Sweeney dissented. He found no reason to disturb the trial court's exercise of discretion but also opined that domestic services in a meretricious relationship are not compensable. *Id.* at 375-76 (Sweeney, A.C.J., dissenting) (quoting Jane Massey Draper, Annotation, *Recovery for Services Rendered by Persons Living in Apparent Relation of Husband and Wife Without Express Agreement for Compensation*, 94 A.L.R.3d 552, 555 (1979)).

ANALYSIS

¶9 Property distribution at the end of a meretricious relationship is reviewed for abuse of discretion. *Koher v. Morgan*, 93 Wn. App. 398, 401, 968 P.2d 920 (1998) (citing *In re Meretricious Relationship of Sutton*, 85 Wn. App. 487, 491, 933 P.2d 1069 (1997)). Among other things, discretion is abused when it is exercised on untenable grounds. *State v. Downing*, 151 Wn.2d 265, 272-73, 87 P.3d 1169 (2004). While we review conclusions of law de novo, findings of fact merely need to be supported by substantial evidence. *E.g.*, *Nordstrom Credit, Inc. v. Dep't of Revenue*, 120 Wn.2d 935, 942, 845 P.2d 1331 (1993).

¶10 "A meretricious relationship is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995) (citing *In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 678 P.2d 328 (1984)). Washington has "a three-prong analysis for disposing of property when a meretricious relationship terminates." *In re Pennington*, 142 Wn.2d 592, 602, 14 P.3d 764 (2000) (citing *Connell*, 127 Wn.2d at 349). First, the court decides whether a meretricious relationship existed. Second, "the trial court evaluates the interest each party has in the property acquired during the relationship. Third, the trial court then makes a just and equitable distribution of such property." *Id.*

¶11 Wimer conceded for the purposes of review that he and Soltero had a meretricious relationship. We turn

now to the second prong, the property characterization. In *Connell*, we clearly held that only property that would be considered community property in a marriage would be subject to a just and equitable distribution upon dissolution of a meretricious relationship. *Connell*, 127 Wn.2d at 351-52.[3] Property acquired during the meretricious relationship is presumed to be community-like, but the presumption is rebuttable. *Id.* Unlike a property distribution in a divorce, the separate property of the parties is *not* subject to distribution. *Id.* at 350. If there is no community-like property, then there is nothing to justly and equitably distribute.

¶12 Wimer argues that the trial court erred by treating the "domestic services" provided by Soltero as community-like property. We read the trial court's letter opinion differently. It appears to us that the trial court found that Soltero's domestic services provided a basis for an equitable distribution. The Court of Appeals affirmed, opining that "the growth in [Wimer's] separate estate between 1992 and 2001 could be considered by the court in determining a proper equitable distribution of property." *Soltero*, 128 Wn. App. at 372. The Court of Appeals is correct that the trial court *could* have found that some portion of the increase in value was community-like property, rather than due to the "natural enhancement" of the separate property. *In re Marriage of Elam*, 97 Wn.2d 811, 814, 650 P.2d 213 (1982). However, while the trial judge could have, he did *not* find that the increase in value was community-like property. Instead, the trial judge specifically concluded that the

---

[3] We hold income and property acquired during a meretricious relationship should be characterized in a similar manner as income and property acquired during marriage. Therefore, all property acquired during a meretricious relationship is presumed to be owned by both parties. This presumption can be rebutted. All property considered to be owned by both parties is before the court and is subject to a just and equitable distribution. The fact that title has been taken in the name of one of the parties does not, in itself, rebut the presumption of common ownership.

*Connell*, 127 Wn.2d at 351 (citations omitted).

increase in Wimer's estate was due to his separate, not community, efforts.[4]

¶13 Soltero argues that both parties "contributed to the community in the meretricious relationship and the entire community efforts are therefore what must be looked at in an equitable distribution." Resp. to Pet. for Review at 5. If she means to say that contributions of effort to the community may increase the value of assets separately held by one party and create community-like interests in that increase, she is correct. But if she means to say that all of Wimer's separate property is potentially subject to equitable distribution, she is incorrect. In *Connell*, we held that only property that would be considered community property in a marriage is subject to distribution. *Connell*, 127 Wn.2d at 351-52. We have been given no grounds to reconsider that opinion.

¶14 Since the trial judge identified no community-like assets to distribute, no equitable distribution under the meretricious relationship doctrine is possible.[5]

## CONCLUSION

¶15 The trial court explicitly found that Wimer's business and real property were his separate property. The court identified no community-like assets. The $135,000 awarded to Soltero could come only from Wimer's separate assets, which are not reachable in a meretricious relation-

[4] Ordinarily, the community would be entitled to the increase of value in property due to the *labor* of each member performed during the relationship, but not to the "natural increase" of the value of separate property. *See Connell*, 127 Wn.2d at 351-52; *In re Marriage of Lindemann*, 92 Wn. App. 64, 960 P.2d 966 (1998). At oral argument, Wimer's counsel contended that he had proved at trial that the increase in value in Wimer's estate was due to his separate efforts *before* the relationship began. That is consistent with, though not explicitly found in, the trial judge's written decision. While we base our conclusion on separate grounds, we accept for purposes of this opinion his characterization of the cause of the increase in value.

[5] Nothing in this opinion should be taken to foreclose the possibility of different theories of recovery being successfully pursued in similar cases. *Cf. Vasquez v. Hawthorne*, 145 Wn.2d 103, 108-09, 33 P.3d 735 (2001) (Alexander, C.J., concurring) (canvassing other theories of recovery in meretricious-like dissolution cases).

ship dissolution. The trial court's decision to make a "distribution" is therefore not sustainable. We reverse and remand to the trial court with direction for entry of judgment consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.