# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHANN MAUREEN WEBLEY, | No. 60970-3-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| VAN ROBERT SENEY, | |
| Respondent. | |

PRICE, J. — In November 2016, Shann M. Webley and Van R. Seney ended their committed intimate relationship (CIR).[1] While the two were together, Webley and Seney lived and worked on Seney's cattle ranch, VS Cattle. Following the termination of their CIR, Webley and Seney could not agree on the appropriate distribution of the community's property, especially the value of the community's property related to VS Cattle, and a trial became necessary. Disappointed with the trial court's order of distribution, Webley appeals.

Webley challenges the trial court's factual findings and conclusions of law, arguing that they result in an unjust and inequitable distribution of assets. First, Webley argues that several findings of fact are not supported by substantial evidence. Second, Webley argues that the trial

---

[1] "A CIR is a 'stable, marital-like relationship' " between two unmarried people; upon the termination of a CIR, a court may equitably divide property in a manner similar to a marriage dissolution. *In re Committed Intimate Relationship of Muridan v. Redl*, 3 Wn. App. 2d 44, 55, 413 P.3d 1072 (quoting *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995)), *review denied*, 191 Wn.2d 1002 (2018).

court erred by failing to address the distribution of specific property related to a contract with a third party. Third, Webley argues that the overall property distribution is inequitable. Fourth, Webley argues that the trial court erred by denying her request for pre-judgment interest.

We affirm.

FACTS

I. BACKGROUND

Prior to 2010, Webley lived and worked on her own wheat and cattle farm, Webley Farms. Meanwhile, Seney lived and worked on his cattle farm, VS Cattle, approximately 15 miles away. Both Webley and Seney spent their lives living and working in the cattle farming industry. In January 2010, Webley and Seney began a relationship, and Webley moved from Webley Farms to VS Cattle to live with Seney.

While Webley and Seney lived together on the VS Cattle farm, they performed the farm work together (although as explained below, the extent and division of labor is disputed). Webley also brought her herd of approximately 20 head of cattle to VS cattle, along with other trucks and equipment to use for farm work.

Webley and Seney separated in November 2016. In April 2017, Webley filed a "Petition for Division of Any Shared Assets and Liabilities & Complaint for Unjust Enrichment, Conversion, and Replevin." Seney initially contested whether the parties had established a CIR. A trial, limited to that issue, was held in October 2023, and the trial court determined that a CIR had been established. That decision was not appealed and is not challenged here.

In mid-2024, a second trial was held to determine the distribution of the community's property.

2

II. TRIAL TESTIMONY

During trial several witnesses testified, including Webley, Seney, and Thomas Sawatzki, an accounting expert retained by Webley. Numerous exhibits were admitted, including leases, tax returns, VS Cattle business records, and documents related to Sawatzki's valuation report.[2]

A. WEBLEY'S TESTIMONY

Webley's testimony focused on the amount of work that she personally performed for VS Cattle and the experience she brought to the business. While Webley conceded that she was never a VS Cattle shareholder, she testified to being deeply involved in its daily operations. Webley testified that she was a "ranch hand," "farm wife," "field man," and "bookkeeper" for VS Cattle. *See* 1 Verbatim Rep. of Proc. (VRP) at 47, 54, 61, 93, 95. She summarized the duties that her roles entailed, including livestock feeding, calving, ensuring water was being pumped properly, moving ranch resources as needed, moving cattle between pastures, vaccinating the animals, handling pesticides, updating financial records and payments using QuickBooks, and cooking for VS Cattle employees. She testified that she performed many of these duties because Seney had physical limitations and an inability to work.

Webley also testified about the merging of her and Seney's business interests. According to Webley, in 2010, she moved in with Seney and together they performed "everyday ranch work as a couple . . . ." 1 VRP at 36. By 2011, Webley had merged all of her cattle with Seney's cattle, and they were all kept in the same pastures. The calves that resulted from the breeding of the two different groups were branded as VS Cattle. While some of Webley's cattle were different from

---

[2] The exhibits admitted at trial were apparently not designated as part of our appellate record.

Seney's, she claimed that the crossbreeding could be beneficial in the long run. Webley also testified that, in addition to the cattle, she brought Webley Farms' equipment to VS Cattle, including trucks, a flatbed trailer, a water tank, and horses.

Webley further testified that she and Seney worked together in acquiring real property and additional income for VS Cattle. Webley testified that she viewed and purchased real properties with Seney in Washington, Idaho, and Oregon. She explained that these properties were purchased with VS Cattle funds.

She also testified that, in addition to land purchases, Webley was involved in a cattle rental agreement between a third party, Walla Walla Team Penners (Team Penners), and VS Cattle. Team Penners was a recreational horseman group that needed cattle for events. Although the group contacted Seney and entered into the rental agreement with VS Cattle, Webley testified that her cattle were "more than likely" included in the group of cattle rented by Team Penners. 1 VRP at 355. She then explained that Seney cashed each of the checks from Team Penners and kept the cash for himself in his safe. The total amount earned from the rental agreement over the course of the CIR was $126,00 and was never declared on VS Cattle tax returns.

Webley testified that neither she nor Seney were paid by VS Cattle throughout the time they lived together. However, they lived in a house on VS Cattle property and used VS Cattle funds to pay for household and living expenses. Webley explained that it was common for farm owners to live on business-owned property and for the business to pay living expenses. Because it was a benefit to the farm, the living and household expenses were also deductible from the business taxes.

4

Overall, Webley testified that she was instrumental in working with Seney to run VS Cattle while she lived there and that she and Seney worked together to grow VS Cattle as a business.

B. SAWATZKI'S TESTIMONY

Also testifying was Sawatzki, an accounting expert retained by Webley, who testified about his valuation of the community assets acquired during the parties' CIR. Sawatzki determined that the shareholder value of VS cattle rose to over $602,000 during the period of the CIR. Sawatzki opined that the increase in shareholder value was due directly to the community's contribution to VS Cattle, and therefore, the increase should be characterized and distributed as community-like property. In other words, Sawatzki testified that Webley should be entitled to half of the increase in shareholder value to VS Cattle from 2010-2016—an amount equaling approximately $301,000.

In his report (which was admitted as an exhibit), Sawatzki also explained that during the CIR, Webley was not paid any wages for the work that she performed for VS Cattle and Seney was paid minimally to fund a retirement account. Assuming a "fair annual wage" and applying statistics for Walla Walla County from the Bureau of Labor, Sawatzki estimated Webley's annual salary would have been $45,000 and Seney's would have been $70,000. Clerk's Papers (CP) at 152. Using those values, Sawatzki calculated that Webley was entitled to one-half of the community's total unpaid wages, amounting to approximately $342,000.

Sawatzki also calculated what he perceived to be the value of the cattle that Webley brought to VS Cattle. He projected the growth of Webley's herd if it had not been comingled into VS Cattle and valued the herd at just over $130,000. Sawatzki also calculated what he determined to be the fair rental value for VS Cattle's use of Webley's pickup truck at $1,000 a year, of her farm equipment at $3,000 a year, of her horses at $500 a year, and of her bulls at $500 a year. Sawatzki

concluded that Webley was owed these amounts, netting a total of just under $182,000, after losses, as her separate property.

Using these components, Sawatzki calculated the total compensation Webley was owed based on two different theories. If the trial court relied on VS Cattle's growth in equity, Sawatzki opined Webley was owed approximately $472,500 (50% x $600,000 for the increase in VS Cattle value + $130,000 for cattle + $35,000 for equipment rental value). If the court relied on unpaid community wages from VS Cattle, Sawatzki opined Webley was owed approximately $524,000 (50% x $684,000 for the unpaid community wages + $130,000 for cattle + $35,000 for equipment rental value).

C. SENEY'S TESTIMONY

Seney testified to a significantly different account of Webley's contributions. Although Seney acknowledged that Webley had certain educational degrees and certifications, he contended that she had limited practical skills that would be useful to VS Cattle. For example, Seney testified that Webley could not operate the large equipment or drive large trucks, which is often necessary to run a ranching business. Seney testified that Webley was essentially a part-time ranch hand with fewer skills than his full-time employees.

Seney also testified that Webley's farm and cattle never merged with VS Cattle. According to Seney, Webley had only 16 head of cattle that were brought to VS Cattle. Seney also testified that, towards the end of their relationship, he and Webley worked out an agreement on what she was owed for the cattle and "pasture rent." 1 VRP at 560. Seney wrote Webley checks for the amounts owed, but Webley apparently never deposited them. Further, the farm equipment that Webley brought over to VS Cattle was old, which made the equipment of little value.

6

Seney agreed that during the relationship, VS Cattle made several separate purchases and acquisitions of real and other property. However, Seney maintained those acquisitions were separate property paid for with separate funds. VS Cattle loan documents and deeds were presented as supporting evidence. Seney also provided a financial statement from VS Cattle, which described its assets and accounting summaries of the acquisitions.

As for the monies paid by Team Penners under the rental contract, Seney testified that they were the separate property of VS Cattle. He explained that VS Cattle provided semi-trailer loads of cattle to Team Penners. He testified that the cattle used by Team Penners all belonged to VS Cattle, that the trucks and trailers used to transport the cattle belonged to VS Cattle, and that any labor required to transport the cattle was provided by VS Cattle. Seney explained that he cashed the checks and kept the funds in cash in his safe because his employees often preferred cash payments. He testified that if he did not pay staff in cash or did not offer cash payment during hiring, he would lose potential workers, especially part-time, seasonal workers.

Seney also disputed Sawatzki's expert testimony, including the values Sawatzki used for Webley's proposed compensation. Seney testified that the increase in shareholder value in VS Cattle was due to the increase in market price for cattle, not because of the contributions of the community. Rather than use a compensation amount derived from VS Cattle's increased valuation, Seney proposed that each party should be compensated for their labor contributions. And Seney testified that Webley's work on VS Cattle should be compensated as if she was a part-time ranch hand, which would be $12 per hour for 20 hours per week.

Seney also claimed that Sawatzki had grossly overestimated the value of Webley's cattle that she brought to VS Cattle. Seney explained that Webley's cattle were a less valuable breed

7

and sold for less. Further, Seney claimed that Sawatzki had not properly understood the growth and production of the cows and had overestimated how the herd would have grown over time. Seney testified that he reached an agreement with Webley to pay her $22,837.50 for her cattle and $2,187 for pasture rent, but that Webley never deposited those payments.

Seney also disputed Sawatzki's assessment of the length of the community's employment for estimating lost wages because VS Cattle was not operational for the entire duration of the CIR. Seney testified that in the Spring of 2015, he began selling off the cattle because he no longer had sufficient property for them. Accordingly, he contended that the community's "employment" at VS Cattle would only have been through that point.

### D. CLOSING ARGUMENTS

Following trial, the parties submitted written closing arguments. Webley argued that, because VS Cattle provided no compensation to the community during the CIR, all of that conferred benefit was available for VS Cattle to reinvest in the company. Further, Webley argued that because the household benefited the company, all regular household maintenance tasks had also been for the benefit of the company, meaning that the community should be compensated for Webley's household work in addition to the farm work.

Webley also argued that the trial court should find her credible and Seney not credible. Webley contended that her positions had been consistent throughout the litigation, but Seney had lied and changed his story on multiple occasions.

Webley further argued for pre-judgment interest on unpaid wages. Because unearned wages could be determined, she argued that the amount was liquidated and certain. Accordingly, Webley requested pre-judgment interest from the date of separation. Webley also requested

attorney fees under CR 11 because of, among other things, Seney's "frivolous arguments." CP at 243.

Webley concluded by requesting that the trial court adopt Sawatzki's valuation that was "premised upon the growth of VS Cattle Company during the relationship time period . . . ." CP at 242. Webley also proposed that she be awarded $63,133.50, which would represent half of the proceeds from Team Penners.

In contrast, Seney's written closing emphasized the separate character of all of his property, including VS Cattle, real property acquired with his separate funds, and all income (including rents, issues, and profits, generated by VS Cattle). Seney underscored that VS Cattle was his separate property with substantial assets before the CIR. Seney contended that Webley never acquired an ownership interest in VS Cattle and, therefore, had no interest in any income generated by VS Cattle. Further, Seney argued that Webley failed to prove that the increase in shareholder value of VS Cattle was due to community contribution, rather than the rise in beef prices. In other words, Seney argued that the increase in VS Cattle value was due to "continued operation of the business and not any special community effort." CP at 222.

Seney argued that the community's compensation should be calculated based on "fair value of wages," which would be $12.00 per hour for Webley and $60,000 per year for Seney. CP at 225. Seney claimed that Webley's work at VS Cattle equated to part-time, approximately 20 hours per week. Further, Seney argued that the VS Cattle operation ended in March 2015, prior to the termination of the CIR. Therefore, compensation for Webley would not run for the entire duration of the CIR, but for only 61 months—during the operation of VS Cattle.

With those concepts in mind, Seney outlined his proposed property valuation for what was owed to the community by VS Cattle. Seney calculated that the business owed the community a total amount of $368,440.00. This amount was comprised of $60,000 per year to compensate Seney ($305,000.00 over the course of the community's employment), and $12,480 per year to compensate Webley ($63,440.00 over the course of the community's employment) for her labor has a ranch hand.

However, Seney also asserted that throughout the CIR, VS Cattle had paid a significant amount, $291,361.18, to the community. This amount was comprised of $53,618.18 that Seney had paid to himself (as a member of the community) from 2010-2015 and $237,743 that VS Cattle had paid for personal checks and credit card payments that benefited the community. By offsetting these payments from the value of the wages owed to the community, $368,440.00 (wages owed to the community) minus $291,361.18 (benefit received by community), Seney argued that VS Cattle owed the community a total of $77,078.82. Thus, Seney argued that Webley was entitled to half of this amount, specifically $38,539.41.

Apart from compensation for community labor, Seney's written closing addressed other items of compensation for Webley. Seney recounted the extensive testimony about Webley's cattle and argued that it was unreasonable to believe Webley's assertion that her cattle were integrated into VS Cattle's herd. Instead, Seney urged the court to rely on the amount of $22,837.50 that Seney and Webley had originally agreed to for the cattle at the end of their relationship. Seney also agreed to owing Webley $2,187 for pasture rents. Finally, Seney argued that Webley was not owed any money from the Team Penners funds because those profits were VS Cattle's separate property.

Finally, Seney argued that Webley was not entitled to pre-judgment interest. Seney argued that because the amount of wages owed was disputed, they were not liquidated and certain. And although the amount of the cattle and pasture rent may be liquidated, Seney argued that Webley should not receive pre-judgment interest because she had refused to cash the checks at the time, not that he had refused to pay her. Seney also argued Webley should not be awarded attorney fees.

In sum, Seney argued that the fair sum owed to Webley should be $63,563.91 ($38,539.42 (50% of total community wages of $77,078.82) + $22,837.50 (Webley Farms' cattle) + $2,187 (pasture rents)).

## III. TRIAL COURT'S ORDER AND DETERMINATIONS

After reviewing the evidence and reviewing written closing arguments, the trial court entered an "Order After Trial re: Remedy" that largely adopted Seney's, not Webley's, arguments.

The trial court fundamentally found that most of the property was separate property that belonged to VS Cattle:

> 6. The Court finds that all labor, business management and decisions, marketing and revenue derived therefrom, along with all proceeds of property and acquisitions of other property and the proceeds thereof, including revenues from sale of cattle, hay, grant and other products, rent of cattle to Walla Walla Team Penners, acquisitor of real estate and sale of real estate, and are the property of VS Cattle Co. and not the committed intimate relationship community.

CP at 252.

The trial court also found that VS Cattle owed both the community and Webley as an individual, and it assigned valuations. Each of the valuations exactly matched those proposed by Seney in his written closing:

> 7. The Court finds that Van Seney and Shann Webley were not adequately compensated by VS Cattle Co. during the committed intimate relationship and

11

adopts the compensation remedy set forth in the closing argument presented by Mr. Seney as to monies that are owed to the community;

8. The Court finds that the community benefited in expenses paid and payments made on behalf of the community by VS Cattle Company and monies owed to the community will be offset by these monies paid on behalf of the community, and adopts the remedy set forth in the closing argument presented by Mr. Seney, resulting in a total of $77,078.82 owed to the community;

9. The Court finds that Shann Webley is owed the sum of $22,837.50 for cattle provided to VS Cattle Co that she was not paid for and $2,187 for unpaid pasture rent;

10. The Court finds that Shann Webley is awarded the sum of $63,563.91, consisting of one-half of the community wages owed to the committed intimate relationship community and the monies owed to her for cattle and pasture rent[.]

CP at 248. The trial court ordered that Webley was owed $63,593.91. The trial court declined to award pre-judgment interest.

Webley filed a motion for reconsideration, which was denied.

Webley appeals.

## ANALYSIS

Webley challenges the trial court's order with several arguments, (1) that the trial court's findings 6, 7, 8, and 9 are not supported by substantial evidence, (2) that the trial court erred by failing to specifically address the Team Penners funds in its order, (3) that the trial court's overall award of $63,563 is inequitable, and (4) that the trial court erred by denying her request for pre-judgment interest. We disagree and affirm.

I. LEGAL PRINCIPLES

A CIR is a stable and marital-like relationship during which the parties cohabitate with the shared knowledge that a lawful marriage between them does not exist. *Connell v. Francisco*, 127 Wn.2d 339, 346, 898 P.2d 831 (1995). Notwithstanding that it is not a marriage, in a

proceeding for the dissolution of a CIR, courts must make a just and equitable distribution of property based on all the facts and circumstances. *Id.* at 347-48; *see also In re Marriage of Stachofsky*, 90 Wn. App. 135, 147, 951 P.2d 346, *review denied*, 136 Wn.2d 1010 (1998). The critical focus in distributing property between the parties is to identify what would have been characterized as community property if they were married and to prevent the unjust enrichment of one party at the expense of the other.[3] *Connell*, 127 Wn.2d at 349.

The distribution of property from a CIR requires a three-step analysis. *In re Marriage of Pennington*, 142 Wn.2d 592, 602, 14 P.3d 764 (2000). First, the trial court determines whether a CIR existed. *Id.* Second, if a CIR existed, the trial court evaluates the interest each party has in the property acquired during the relationship. *Id.* Third, the trial court makes a just and equitable distribution of the community-like property. *Id.*

Generally, we review the trial court's CIR property distribution order for an abuse of discretion. *Morgan v. Briney*, 200 Wn. App. 380, 387, 403 P.3d 86 (2017), *review denied*, 190 Wn.2d 1023 (2018). A trial court abuses its discretion if its decision is manifestly unreasonable, adopts a position no reasonable judge would take, is based on untenable grounds, or misapplies the law. *In re Committed Intimate Relationship of Muridan*, 3 Wn. App. 2d 44, 54, 413 P.3d 1072, *review denied*, 191 Wn.2d 1002 (2018). In these types of decisions concerning the

---

[3] There are differences between a CIR and a marriage. "Unlike dissolution proceedings following a marriage, . . . where the court may award one party's separate property to the other to achieve a just and equitable distribution, a trial court dealing with the termination of a committed intimate relationship may distribute only property that would qualify as community property were the parties legally married, and the court abuses its discretion by dividing property acquired prior to the relationship." *In re Marriage of Byerley*, 183 Wn. App. 677, 685, 334 P.3d 108 (2014).

distribution of property, trial courts enjoy "broad discretion." *In re Marriage of Brewer*, 137 Wn.2d 756, 769, 976 P.2d 102 (1999).

We review the trial court's findings of fact for substantial evidence. *Soltero v. Wimer*, 159 Wn.2d 428, 433, 150 P.3d 552 (2007). Substantial evidence supports a trial court's finding when, viewed in the light most favorable to the prevailing party, the evidence would persuade a rational, fair-minded person of the finding's veracity. *In re Muridan*, 3 Wn. App. 2d at 57. We will not disturb a finding of fact that is supported by substantial evidence even if there is conflicting evidence. *In re Marriage of Burrill*, 113 Wn. App. 863, 868, 56 P.3d 993 (2002), *review denied*, 149 Wn.2d 1007 (2003). We defer to the trial court's weighing of the evidence and witness credibility determinations. *In re Muridan*, 3 Wn. App. 2d at 55. Unchallenged findings of fact are verities on appeal. *In re Custody of A.T.*, 11 Wn. App. 2d 156, 163, 451 P.3d 1132 (2019).

We review a trial court's conclusions of law de novo to determine whether its conclusions properly flow from its factual findings. *Perez v. Dep't of Lab. & Indus.*, 28 Wn. App. 2d 916, 921, 542 P.3d 584 (2023), *review denied*, 2 Wn.3d 1033 (2024).

II. CHALLENGED FINDINGS OF FACT

Webley challenges the trial court's findings of fact 6, 7, 8, and 9.[4] Specifically, Webley argues that these findings are not supported by substantial evidence because they do not accurately

---

[4] The trial court failed to label or differentiate between findings of fact and conclusions of law in its order determining remedies. Although most of the trial court's "findings" begin with the language "The Court finds," not all of the findings are exclusively factual. The labels used in an order following trial do not control our review of findings of fact and conclusions of law. *See Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986) (findings of fact erroneously labeled conclusions of law are reviewed as findings of fact; and conclusions of law erroneously labeled findings of fact are reviewed as conclusions of law). When a determination concerns whether the evidence has established the existence or occurrence of something, it is properly

reflect the value of the property the community acquired from VS Cattle during the CIR. We disagree.

In characterizing property as separate or community-like for the purposes of distribution, property acquired during a CIR is presumed to be community-like property. *Morgan*, 200 Wn. App. at 390. Separate property is property acquired before the CIR or acquired after the CIR by gift, bequest, devise, or descent. *See In re Marriage of Chumbley*, 150 Wn.2d 1, 5, 74 P.3d 129 (2003). But, even if acquired during the CIR, property still retains the character of the funds used to purchase it. *Briney*, 200 Wn. App. at 390.

Here, it is undisputed that VS Cattle was formed by Seney prior to the CIR, and therefore, the business was Seney's separate property. And Webley does not assert that VS Cattle lost its character as separate property during the CIR. The basic facts about VS Cattle and the CIR are undisputed; specifically, neither party disagrees that (1) Webley and Seney lived together on VS Cattle property, (2) VS Cattle paid Webley and Seney's household and living expenses, (3) Webley and Seney performed work for VS Cattle, and (4) VS Cattle did not pay regular salary or wages to Webley and Seney.

One of the disputed issues is to what extent did the community acquire an interest in the increased value of VS Cattle. Webley argued that her extensive contributions to the business (specifically her labor, expertise, cattle, and equipment) resulted in an increase to the equity value

---

labeled a finding of fact. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871-72, 439 P.3d 694 (2019). But when a determination requires legal reasoning or legally significant interpretation based on the evidence or factual findings, it is a conclusion of law. *Id.* Here, we review each challenged finding based on its actual character and the arguments challenging it, regardless of whether it is labeled a finding of fact.

of VS Cattle. Thus, the community acquired a property interest in the increased equity value in VS Cattle. Webley's claim was supported by her testimony, as well as Sawatzki's testimony.

In contrast, Seney claimed that any increase in VS Cattle's equity was not due to the community's labor, but rather it was rooted in regular business operations and the increase in the market price of cattle. Seney argued that the property acquired by the community during the CIR was limited to the value of salary and wages that Seney and Webley earned for their work for VS Cattle. Seney supported his argument based on financial records and his testimony about VS Cattle operations and daily work and activities during the CIR.

Ultimately, this created a dispute regarding weighing of evidence and credibility that was required to be resolved by the trial court. Based on the trial court's findings, the trial court clearly found Seney's testimony more credible than Webley's testimony, as evidenced by the trial court's wholesale adoption of valuations consistent with Seney's testimony and his written closing. Webley argues that Seney's testimony should not have been found credible or accepted over Sawatzki's testimony and valuations, but credibility determinations are for the trial court, and we will not second-guess them on appeal. *In re Muridan*, 3 Wn. App. 2d at 55.

Once we reject the invitation to substitute our own credibility assessments for the trial court's (as we must), Seney's testimony provides substantial evidence to support finding of fact 6, as well as the other findings challenged by Webley. Finding of fact 6 essentially determines that the profits, income, and increased value of VS Cattle remain the property of VS Cattle, and as a result, Seney's separate property. Similarly, trial testimony supports findings 7 and 8 that VS Cattle generally failed to pay salary and wages to Seney and Webley and those unpaid funds were property acquired during the CIR. And Seney's testimony supports the trial court's valuation of

16

the reasonable amount of the unpaid salary and wages. Finally, Seney's testimony supports the valuation of Webley's cattle and pasture rent reflected in finding of fact 9. Even though Webley and Sawatzki both disputed Seney's testimony, it does not follow that substantial evidence did not support these findings. *See In re Burrill*, 113 Wn. App. at 868 (holding that findings may be supported by substantial evidence, even if "other evidence may contradict it").

Because we do not review the trial court's credibility determinations, substantial evidence supports the trial court's findings of fact. *In re Muridan*, 3 Wn. App. 2d at 55. Accordingly, Webley's challenges to the trial court's findings of fact 6, 7, 8, and 9 fail.

III. TEAM PENNERS FUNDS

Webley next argues that the trial court erred by failing to include or consider the Team Penners funds in its order. We disagree.

Again, the character and consideration of the Team Penners funds was disputed by the parties. Webley claimed that Seney took the income paid for the cattle rental to the Team Penners into personal funds by keeping the cash rather than depositing it into VS Cattle accounts. Seney testified that VS Cattle organized, managed, and executed the cattle rental to the Team Penners and the payment was kept in cash because it was often necessary to pay ranch workers in cash. In other words, Seney claimed that the payments from Team Penners were exclusively the income of VS Cattle, used for the purposes of VS Cattle.

Although Webley disagrees with Seney's testimony, here, too, the trial court appears to have found Seney's account more credible as finding of fact 6 specifically finds that funds resulting from the "rent of cattle to Walla Walla Team Penners" was the property of VS Cattle and not the

17

community.  CP at 252.  And, again, we do not review credibility determinations.  *In re Muridan*, 3 Wn. App. 2d at 55.

Once the Team Penners proceeds were characterized as VS Cattle property and not community-like property, and considering that the trial court chose to compensate the community through wages rather than with a share of the increase in value of the business, it was not necessary for the trial court to address specifically the distribution of the Team Penners funds in its order. Any value owed to Webley for her efforts related to Team Penners would have been accounted for in salary and wages owed by VS Cattel to Webley.  Accordingly, the trial court did not err by failing to further include the Team Penners funds in its order determining remedies.

IV. TRIAL COURT'S DISTRIBUTION OF PROPERTY

Webley ultimately argues that the trial court failed to carry out an equitable and just distribution of property between Webley and Seney.  We disagree.

As discussed above, the trial court's findings were supported by substantial evidence in the record.  Although Webley disputes Seney's testimony and the trial court's credibility determinations, Webley has not shown that the trial court's distribution of assets was unjust and inequitable in light of all the facts and circumstances of the distribution proceeding as a whole. *See In re Stachofsky*, 90 Wn. App. at 147.  We acknowledge that if the trial court had found Webley's testimony about her contributions more credible than Seney's testimony, an equitable property distribution may have landed in a different place.  But we must leave those credibility determinations alone.  In that light, the trial court did not abuse its "broad discretion" in its division of assets by assessing the value of the community's labor and Webley's separate contributions,

each based on substantial evidence, and reimbursing Webley accordingly. *In re Brewer*, 137 Wn.2d at 769. Thus, we affirm the trial court's distribution of property.

## V. TRIAL COURT'S DENIAL OF PRE-JUDGMENT INTEREST

Finally, Webley argues the trial court erred when it declined to impose pre-judgment interest. We disagree.

Pre-judgment interest is awardable:

> (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

*Rekhter v. State*, 180 Wn.2d 102, 124, 323 P.3d 1036 (2014) (quoting *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968)). "A claim is liquidated 'where the evidence furnishes data which, if believed, makes it possible to compute the amount with *exactness*, without reliance on opinion or discretion.' " *Id.*

Here, the trial court found "there is no basis for awarding pre-judgment interest" and declined to do so. CP at 253. Webley makes three arguments to support her claim that the trial court erred by declining to award pre-judgment interest.

First, Webley argues that the Team Penners funds were liquidated and the result of a contract and, therefore, pre-judgment interest was warranted for those funds. However, as explained above, the trial court found that the Team Penners funds were VS Cattle income and not community-like property. Because Webley was not entitled to half of those funds, she would not be entitled to pre-judgment interest on them.

Second, Webley argues that her lost wages are a liquidated amount and she was entitled to pre-judgment interest on those funds. But the determination of the value of unpaid wages was dependent on the discretion of the trial court in determining the amount to be awarded. The amount of compensation to which Webley was entitled was heavily disputed at trial. Even on appeal, Webley argues that she is entitled to significantly more compensation than the trial court awarded. It follows, then, that the amount of compensation Webley is owed from VS Cattle could not have been computed with *exactness*, and therefore was not liquidated. *See Rekhter*, 180 Wn.2d at 124. Thus, the trial court did not err by declining to award pre-judgment interest on Webley's unpaid wages.

Third, Webley appears to argue, citing *In re Marriage of Rockwell*, that the trial court could have ordered pre-judgment interest as part of fashioning an equitable remedy. The court in *Rockwell* noted, "A dissolution is an equitable proceeding in which the trial court *has broad discretion* to fashion remedies," including using pre-judgment interest as a "tool[] in fashioning an equitable remedy for the loss of use of a liquidated sum." *In re Marriage of Rockwell*, 157 Wn. App. 449, 454, 238 P.3d 1184 (2010) (emphasis added). As noted above, Webley has failed to establish that she was entitled to any liquidated sums that would justify imposing pre-judgment interest. But even if equity alone were sufficient to justify awarding pre-judgment interest, doing so is within the trial court's discretion. And, here, Webley has failed to show that the trial court's disinclination to exercise such discretion was a decision that no reasonable judge would make. *See In re Muridan*, 3 Wn. App. 2d at 54.

We affirm the trial court's order declining to award pre-judgment interest.

CONCLUSION

In the dissolution of her CIR with Seney, Webley provided testimony and argument that, if adopted by the trial court, could have led to a larger award. But the parties had very different positions, and Seney's testimony diverged sharply with Webley's on fundamental issues. After personally observing all of the witnesses and considering all of the testimony and evidence, the trial court clearly determined Seney's testimony was more credible. In our appellate role, we are constrained to leave that determination undisturbed.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

VELJACIC, J.